IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRIAN BUTZ | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| HERCULES CEMENT CO., et al. | : | NO. 14-CV-3052 |

FILED
MAY 11 2016
MICHAEL E. KUNZ, Clerk
By_____Dep Clerk

MEMORANDUM AND ORDER

Ditter, J.                                                                                  May 10, 2016

In this case, Plaintiff contends his employment was terminated in violation of an applicable collective bargaining agreement and that his union failed in its duty of fair representation. Plaintiff's termination resulted from his failure to pass random drug testing. His union represented him in the grievance process but was unsuccessful in obtaining his reinstatement. This lawsuit followed.

It is now before me on motions for summary judgment by the employer and union, both of which I will grant.

I. Factual background

The following facts are not in dispute:[1]

1. Plaintiff Brian Butz is a citizen of Pennsylvania.

---

[1] These thirty-seven paragraphs of undisputed facts are set forth in Hercules' memorandum of law in support of its motion for summary judgment, and in his response, Butz admits each of them. Citations to the record in support of each fact are contained in the memorandum.

-1-

2. Hercules is a corporation with its principal place of business in Pennsylvania. Hercules is a cement manufacturer with a manufacturing plant in Stockertown, Pennsylvania.

3. International Brotherhood of Teamsters, Local 773, represents many of the employees working at the Stockertown cement plant, including Butz.

4. Hercules and Local 773 are parties to a collective bargaining agreement ("CBA") that was effective from June 26, 2010, through June 25, 2014, and covered the unionized employees at the plant.

5. The Management Rights article in the CBA gives Hercules the right to discharge employees for just cause.

6. The CBA also includes a Substance Abuse Program that permits Hercules to drug test employees.

7. The Substance Abuse Program calls for random drug and alcohol testing of employees.

8. The Substance Abuse Program provides that Hercules may require an employee who tests positive for drugs to "(1) enroll in a rehabilitation program; (2) successfully complete all components of the program; and (3) retain a release from a physician stating that the employee is able to safely work."

9. Finally, the Substance Abuse Program provides that an employee who fails a drug test and subsequently completes a substance abuse treatment program "must test

negative and receive a release from a physician prior to returning to work." If the employee fails the drug test after his release from the program, the Substance Abuse Program states that the employee "will be terminated."

10. Butz was hired by Hercules on February 22, 2005 as a Control Room Operator.

11. Butz held the position of Control Room Operator at the time of his termination on April 3, 2013.

12. On January 29, 2013, Butz was given and failed a random drug test. More specifically, the test results came back as "specimen substituted."

13. On February 6, 2013, Butz learned that he would be retested. He "punched out" for the day before the test occurred and went home.

14. On February 9, 2013, Butz failed another drug test. The drug test results showed that his specimen was "diluted."

15. On February 15, 2013, Butz was advised that he would be drug tested yet again. When informed that he would be retested, he stated, "Well in that case, I'm calling off sick," and further stated that he was going to find Union Steward Tim Groller. Butz then left the plant without being drug tested.

16. Later that same day, Hercules informed Butz by letter that because of his diluted or substituted specimens and his evasion of other tests, he was considered to have tested positive, would be suspended until he complied with the relevant Substantive Abuse

Program provisions, and needed to contact the employee assistance program to receive substance abuse treatment. Butz attended this program on February 21 and 25, 2013, and was released from the program.

17. On February 27, 2013, after being released from the employee assistance program, Butz took another drug test as required by the CBA. He went to an occupational health lab and was monitored while giving his urine sample. Butz failed the test by testing positive "for an illegal form of amphetamines."

18. On March 21, 2013, management and the union met with Butz. During this meeting, his February 27, 2013 positive test result was discussed. Hercules also explained the procedure that Butz needed to follow if he wanted his February 27 urine sample retested.

19. During the March 21, 2013 meeting, Butz was asked to provide his side of the story and stated, "I would just like my job back. I screwed up."

20. Butz also contended that he had been on Wellbutrin for years and forgot to tell the people who handled the drug test of his Wellbutrin use, which (according to him) could have resulted in a false positive. Butz admits, however, that his use of Wellbutrin had not resulted in false positives in the roughly ten previous drug tests he had taken while employed at Hercules.

21. On March 22, 2013, Butz stopped by the plant office to discuss retesting the urine specimen he provided on February 27, 2013. Butz informed Plant Manager Richard

-4-

Zimmel that he was not going to waste his money on paying for the retesting of the sample because it was just going to come back positive. Hercules sent Butz a letter dated March 22, 2013, explaining that he had until March 29, 2013 to have his specimen retested and would remain on suspension status until that date.

22. On March 25, 2013, Butz visited Zimmel with Union Steward Rocky Schoenenberger. This time, Butz explained that he wanted his February 27, 2013 specimen sample tested for Wellbutrin to prove whether or not the sample that had tested positive for amphetamines was really his urine. Zimmel informed Butz that even if the sample did not have Wellbutrin in it, it would not prove anything because Hercules did not know if he took Wellbutrin on the day of his drug test. Zimmel informed him again, however, that he could have his sample from February 27 retested and explained the process to have the sample retested.

23. On March 28, 2013, Butz talked to Zimmel again and told Zimmel that if he got his job back, he would be a "choir boy going forward." Zimmel informed Butz that "[w]e got a policy we got to follow, and we'll make a decision early next week."

24. Butz's employment was terminated on April 3, 2013.

25. On April 16, 2013, another test of Butz's February 27, 2013 urine sample was conducted, and the retest "confirmed the test results for an illegal use of amphetamines."

26. On April 7, 2013, Local 773 contested Butz's dismissal by filing a grievance alleging: "On April 3, 2013, I was unjustly terminated for testing positive on a drug test." The Grievance is signed by Chief Steward Groller on Butz's behalf.

27. A "grievance" is "any . . . dispute arising as a result of the interpretation or application of a specific provision in the [CBA]" (*i.e.*, a claim for breach of contract). The CBA provides for a four-step process to resolve grievances. Step 1 requires the aggrieved employee to present his grievance to his Shop Steward and Supervisor. If a satisfactory settlement is not reached, Step 2 calls for a meeting of the Shop Steward and Chief Steward, the aggrieved employee (if he desires to be present), the department manager, and the Plant Manager to discuss the grievance. If the grievance still is not resolved, Step 3 requires Local 773's Business Representative to take the matter up with Hercules. Unlike the Step 2 meeting, the CBA contains no requirement that the aggrieved employee be present for the Step 3 meeting. After the Step 3 meeting, Hercules must notify the Local 773 Business Representative whether the grievance is "resolved, granted or denied" in a written response. Finally, Step 4 gives Local 773 "the right," but contains no obligation, "to submit the grievance to Arbitration" if the matter is not resolved by management's Step 3 response. Local 773 must demand arbitration within 15 days after receipt of the Step 3 response.

28. Here, Hercules denied the grievance over Butz's dismissal at Steps 2 and 3. Butz participated in the Step 2 meeting, but he did not attend the Step 3 meeting. He contends that no one invited him to the Step 3 meeting.

29. On July 13, 2013, Hercules submitted its written Step 3 response to Local 773, stating that "Mr. Butz was treated more than fair under the terms of the Substance Abuse Program."

30. Local 773 had fifteen days after receiving Hercules' written Step 3 response to seek arbitration.

31. Local 773 declined to advance the grievance to arbitration.

32. Butz admits that there is just cause to terminate a control operator who tests positive for amphetamines at work:

> Q. And would you agree that it would be a dangerous thing for everybody in the plant for a control room operator to be doing his job while under the influence of amphetamines?
>
> A. I guess it would be, yes. Yes, taking a drug, yes.
>
> Q. And, in fact, you would agree that a control room operator reporting to work under the influence of amphetamines would be just cause for termination of employment, right?
>
> A. Yes, it would be. I wouldn't lie to you.

(Pl. Dep. Tr. 277:10-16.)

33. Butz also admits that evading a drug test could reasonably be perceived as evidence that an employee is under the influence of illegal drugs and is also just cause for terminating an employee:

> Q. And a control room operator intentionally avoiding a drug test would reasonably be perceived as evidence that the employee was under the influence of illegal drugs, correct?
>
> A. Correct.
>
> Q. And also would be just cause for termination of employment?
>
> A. Correct.

(Pl. Dep. Tr.277:17-278:1.)

34. Butz testified that his claim against Local 773 for breach of duty is based solely on its decision not to pursue his claim to arbitration.

35. Butz admits that he has no actual evidence supporting an alleged conspiracy between Local 773 and Hercules.

36. He admits that the CBA does not contain a requirement that the aggrieved employee be present at Step 3.

37. Although he thinks it is wrong, Butz admits that his grievance would have been difficult to win at arbitration and that the union had no legal obligation to take a case to arbitration.

In summary, Butz either dodged drug tests or failed them. As a result, he was suspended and required to participate in a substance abuse treatment program. Immediately

-8-

after completing the program, Butz failed another test. His termination followed. To prove his claim, Butz needs to establish that Hercules breached the collective bargaining agreement and that the union breached its duty of fair representation.

II. Standard of review

The standard for summary judgment is well-established. I must consider the evidence in a light most favorable to the non-moving party. If there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.

Butz alleges a hybrid claim under Section 301 of the Labor Management Relations Act ("LRMA"), 29 U.S.C. §185. In a hybrid case, the plaintiff typically challenges his termination under a CBA after his union has declined to raise a challenge or had been unsuccessful in its challenge through the dispute procedures set forth in the CBA. Thus, the plaintiff must challenge both the violation of the CBA and his union's representation in the dispute resolution process of the CBA.

These claims are "inextricably interdependent." *Del Costello v. Int'l Bd. of Teamsters,* 462 U.S. 151, 164 (1983). To prevail, Butz "must not only show that his discharge was contrary to the contract but must also carry the burden of demonstrating ta breach of duty by the Union." *Id.* (quotations and citations omitted).

III. <u>Discussion</u>

A. <u>Hercules' alleged breach of the CBA</u>

Butz contends that Hercules violated the terms of the collective bargaining agreement in these five ways:

First, in connection with his drug tests, Hercules relied upon certain forms that differed from those referred to in the CBA. However, the CBA, does not require particular forms be used, Butz does not asset that his termination came because these forms were used, or refer to any evidence that suggests the choice of forms had anything to do with his termination.

Butz next asserts that he was randomly selected for drug testing when only employees who had undergone rehabilitation or counseling could be selected at random.

He is simply wrong. A supplement to the CBA provides that approximately ten percent of Hercules' employees will be selected for drug testing by a computer program that is operated by an independent, third party.

Butz's third contention is that he was entitled to have a union representative present during his drug tests. That right, however, does not exist for those who have been randomly selected for testing. It only extends to employees Hercules orders tested because of some "occurrence."

Butz next contends that the CBA did not authorize Hercules to treat a test as failed when its result showed the sample was a substitution. However, in his amended complaint,

-10-

he asserts he failed this test as well as the one where the specimen had been diluted. Butz can hardly blame Hercules for agreeing with his characterization of the tests. Moreover, this test did not result in Butz's loss of employment. Instead, Butz was ordered to submit to another test because this test was invalid. It was only after repeated avoidance of the test, participation in a drug program, and positive result on his return to work following the program, that Hercules terminated Butz's employment.

Finally, Butz contends Hercules breached the CBA because he drove himself to the test site when the CBA entitled him to a ride. However, he provides nothing that suggests that but for a company car and driver he would not have evaded two tests and failed two others.

In sum, Butz has failed to show that Hercules violated the CBA, or if it did so, that the violation led to his termination. Moreover, he did not file a grievance objecting to any of these complaints at the time they occurred as required by the CBA, thus they are waived.

B. Local 773's alleged breach of its duty of fair representation

Since Butz has not established any breach of the CBA by Hercules, I need not consider his assertion that his union failed in its duty of fair representation. Nevertheless, I shall do so.

The CBA has a four-step grievance procedure that is described above. Local 773 contested Butz's termination. The first two steps call for meeting with the shop steward and then the chief steward. At Step 3, the union's business representative meets with a

representative of management. Step 4 provides that either party may take the matter to arbitration.

Butz contends that he had a right to attend the Step 3 meeting and claims he was never notified that it was taking place. After the meeting, Hercules denied the grievance and upheld Butz's termination. Local 773 accepted that decision and took the matter no further.

Carefully choosing his language, Butz claims that there is *no indication* on the union's letters to Hercules that he was advised of its actions. He does not say he was not notified nor that he was not aware of what was taking place – merely that Local's 773's correspondence does not show that he was.

All that is beside the point: As I said, the CBA provides for a meeting between the union's business representative and the company. The grievant has no right to attend. Similarly, the grievant has no right to a Step 4 arbitration or to participate in a decision not to seek arbitration. It follows that there was no failure on the union's part to take the matter beyond Step 3.

Butz also contends that Local 773 was hostile to him and speculates that it did not take his grievance to arbitration because of a collusive agreement with the company. He admits he has no supporting evidence of either assertion and the fact that the union filled out his grievance forms, attended meetings and negotiated on his behalf, and pursued his grievance through Step 3 shows there is no merit to his speculation.

In sum, there is no evidence that the union denied him fair representation. Step 4 gives Local 773 "the right," but contains no obligation, "to submit the grievance to Arbitration" if the matter is not resolved by management's Step 3 response. Local 773 must demand arbitration within 15 days after receipt of the Step 3 response. However, "the mere refusal of a union to take a complaint to arbitration does not establish a breach of duty, even if the member's claim was meritorious." *Findley v. Jones Motor Freight, Div. Allegheny Corp.*, 639 F.2d 953, 958 (3d Cir, 1981). In fact, "[t]he union has an obligation not to assert or press grievances which it believes in good faith do not warrant such an action." *Bazarte v. United Transp. Union*, 429 F.2d 686, 872 (3d Cir. 1970). Butz has not offered any evidence that the decision of the union was for any arbitrary reason or was made in bad faith.

IV. Conclusion

Based on the lack of any evidence from which a reasonable finder of fact could conclude that Hercules's decision to discharge Butz was the result of any breach of the CBA, or that Local 773 failed in its duty of fair representation, I shall grant the motions for summary judgment filed by the defendants.

An appropriate order follows.